# AUTOMATIC ARC WELDING CO. v. GENERAL ELECTRIC CO.

District Court, S. D. New York.
Dec. 5, 1932.

Moses & Nolte, of New York City (James N. Catlow, of New York City and William F. Buckley, of Milwaukee, Wis., of counsel), for plaintiff.

Charles Neave, of New York City (William H. Davis, of New York City, Harrison F. Lyman, of Boston, Mass., and John Hoxie, of New York City, of counsel), for defendant.

COXE, District Judge.

This is an infringement suit involving five patents to Morton relating to electric arc welding. The main patent, No. 1,648,560, was issued November 8, 1927, and covers both a method of electric arc welding and means for its application; and collateral to it is patent No. 1,648,563, issued November 8, 1927, on a division of the application for the main patent, covering relay and clutch mechanism. There are also three subsidiary patents covering auxiliary features of the principal system, namely, the track welding patent, No. 1,278,985, issued September 17, 1918, the stabilizing resistance patent, No. 15,313, reissued March 21, 1922, and the current conveying patent, No. 1,620,219, issued March 8, 1927.

The claims in issue are Nos. 2, 9, 11, 14, 16, 22, 23, 46, and 64 of the main patent, No. 1,648,560, Nos. 5 and 13 of patent No. 1,648,563, No. 34 of patent No. 1,278,985, Nos. 8, 20, and 25 of the reissue patent, No. 15,313, and Nos. 5 and 7 of patent No. 1,620,219.

The defenses are invalidity and noninfringement with respect to all five patents.

The complaint, in addition to charging infringement, contains allegations that the defendant harassed and delayed Morton in the Patent Office proceedings, and testimony was offered at the trial in support of these allegations, subject to motions to strike. These motions are now before me for disposition, and I think they should be granted, inasmuch as the testimony has no logical bearing on the issues of validity and infringement involved in the suit.

The main patent, No. 1,648,560, and the track welding patent, No. 1,278,985, were before the Circuit Court of Appeals for the Seventh Circuit in the case of Automatic Arc Welding Co. v. A. O. Smith, Corp'n, 60 F. (2d) 740, and were there given a very limited scope and held not to have been infringed by systems closely similar, both in organization and method of operation, to the devices manufactured and sold by the defendant, and charged with infringement in the present action. A motion for reargument of this case was recently denied by the Circuit Court of Appeals.[1]

The plaintiff insists that Morton was the first to control the arc in metallic arc welding, and that he is therefore a pioneer. The art of automatically regulating electrode feed to maintain a constant arc length is, however, an old one; and it had reached a high state of development before the advent of Morton. It originated with carbon arc lamps, as illustrated by the patents to Sample et al., No. 248,111 (1881), Keith, No. 257,588 (1882), and Gravier, No. 278,304 (1883). It was later extended to motion picture projection arc lamps with such patents as Scherff, No. 1,-212,115 (1917), and Standeford, No. 1,289,-294 (1918). It also found a place in the regulation of electric feed in electric arc furnaces, as shown by the patents to Contardo, No. 677,439 (1901), and Raddatz, No. 775,-282 (1904). Then it was applied to carbon arc welding machines, as indicated by the patents to Hall & Metzger, No. 996,406 (1911), and Metzger, No. 1,029,389 (1912); and finally it was drawn upon to regulate the feed of metallic electrodes in metallic arc welding, as exemplified by the Sessions patent, No. 1,287,774 (1918). This was all analogous art to Morton, as was forcibly pointed out by Judge Evans in the opinion in the A. O. Smith Case, and it "left little or nothing for Morton to monopolize." Automatic Arc Welding Co. v. A. O. Smith Corp'n, supra (C. C. A.) page 744 of 60 F. (2d). Moreover, four of the prior art patents, namely, Slawianoff, No. 577,329 (1897), Metzger, No. 1,029,389 (1912), Zerener, British patent, No. 18,523 (1890), and Zerener, German patent, No. 154,335 (1904), all expressly recognize that automatic regulators of arc lighting systems are available for use in welding devices. I am clear, therefore, that on this showing Morton is not entitled to the status of a pioneer.

The main Morton patent, No. 1,648,560, discloses three arrangements for automatically regulating electrode feed, and in each the regulation is effected by changing the rate of a continuous forward feed without interruption or reversal. Thus in Figs. 1 and 2 there is shown a system of change speed gearing operated automatically through a solenoid in the welding circuit, and a relay, so as to produce any of three forward speeds of electrode feed. The drive shaft is in continuous driving connection with the electrode, and the electrode must always be continuously fed forward at one or the other of three definite rates. Similarly, in Figs. 3 and 4, where the rate of electrode feed is varied in accordance with conditions at the arc, as represented by varying amounts of

---

[1] No opinion filed.

current flowing therethrough, the proposal is to vary the speed of the electrode feed motor M always connected to and continuously driving the electrode feed rolls.

It was admitted by Morton at the trial that the structure of Figs. 1 and 2 of the main patent had never been built, and that the same was true of the system of Fig. 3. He stated, however, that a working embodiment, with some changes, of the system of Fig. 4 had been constructed, and operated successfully. He also testified that he had approached some twenty-eight manufacturers with the idea of commercializing his inventions, but had not been able to interest any of them. He did, however, grant licenses to two large manufacturers for substantial considerations. Manifestly, this is not a record of any considerable commercial success.

The Morton arrangement is in principle similar to Standeford, No. 1,289,294, which regulates by automatically varying, in accordance with conditions at the arc, the rate of speed of a variable speed electrode feed motor. Other systems of the same general type are shown in the patents to Keith, No. 257,588, Pyle, No. 356,788, Hopkins, No. 618,-509, and Raddatz, No. 775,282.

The defendant's device operates on an entirely different principle from that of Morton, and is a logical development from Sessions, No. 1,287,744, Scherff, No. 1,212,115, and Moul, British patent, No. 11,704 (1913). In Sessions, the rate of electrode feed is regulated by intermittently interrupting the driving connection between a constant speed driving mechanism and the electrode. This interruption is brought about by the shifting of a clutch, the operation of which is controlled by a solenoid connected in the welding circuit so as to respond to pull upon its armature to changes in arc length, and operating against the force of a balancing spring, to shift the driven member of the clutch. Movement of the driven clutch member in one direction causes a forward feed of the electrode; and movement in the opposite direction effects a reversal of the feed to retract the electrode from the arc. The Scherff patent shows in an automatic electrode feed regulator for motion picture apparatus a system similar to Sessions, except that the clutch is of the magnetic type and the action of the solenoid is controlled through a relay. Moul also has a magnetic clutch and a relay.

The defendant's M C head is merely a good engineering embodiment of the Sessions patent, which the defendant owns. It has, however, three improvements over Sessions.

namely (1) the regulation is by arc voltage instead of by current at the arc, as with Sessions; (2) a relay has been added; and (3) the clutch in the defendant's M C head is magnetic. These refinements in the M C head were designed to give greater sensitivity, and were well-known expedients in the electrical art. The change from current control to voltage control was believed to have advantages; but in any event it differs from Morton, who, like Sessions, uses current control. The relay used was admittedly a standard form, and its presence for such a purpose is shown in the Scherff and Moul patents. So also was the magnetic clutch old in the art, and fully disclosed by Scherff and Moul.

The plaintiff insists, however, that there is considerable clutch slippage in the defendant's M C head, and that it therefore attains the "correctively variable rates correlated to arc length requirements," produced by Morton; and an effort was made at the trial to prove the point by means of oscillograms showing the operation of the defendant's machine under varying conditions. I do not think, though, that these oscillograms indicate anything more than intermittent movement; and the clutch slippage, whatever it may have amounted to, was inconsequential, and merely the result of shifting from one driving cone to the other. It was in no sense "regulated," as insisted by the plaintiff, and was reduced to an almost negligible extent by reason of the fact that the clutch was magnetic. Furthermore, the defendant's instructions to users of the machines emphasized that lubricants were not to be used, but that the clutch was to be kept dry, thereby discouraging any attempt to produce clutch slippage. In any event, I do not see how infringement can be predicated on a mere result, as long as the two systems do not employ substantially the same means; and I am satisfied in the present case that the defendant in its M C head has used entirely different means from those disclosed by Morton.

With respect to the claims of the main patent, I agree with the opinion in the A. O. Smith Case [Automatic Arc Welding Co. v. A. O. Smith Corp'n, supra (C. C. A.) page 744 of 60 F.(2d)] that claims such as Nos. 14 and 23 "are clearly too broad to be sustained as valid." These claims cover broadly means for "regulating" or "controlling" the speed of the electrode "either side of normal." Standeford, No. 1,289,294, does the same thing in an arc light apparatus, and his feed motor is connected in shunt to the arc, with the speed varying in accordance with arc

length. The same is largely true of the British patent to Zerener, No. 18,523, which operates on the same general principle. It can hardly be successfully maintained, therefore, that Morton did more than devise a particular organization for the application of well-known principles; and he should be limited strictly to that specific organization.

Claim 22 of the main patent, relating to circumferential welding, requires little comment, as it obviously refers to the particular Morton organization, and is therefore not infringed.

■ The four minor patents received comparatively little attention at the trial, and merit little consideration here. The relay and clutch patent, No. 1,648,563, shows figures identical with Figs. 1 and 2 of the main patent, and claim 5 refers to a "variable speed clutch," which, as already pointed out, the defendant does not have in the form shown by Morton. I think, therefore, that both claims 5 and 13, which are the only ones in issue, must be limited to Morton's particular organization, and, as so limited, they do not infringe.

■ The track welding patent, No. 1,278,985, shows a welding head mounted on a track, and arranged in such a way that, as the welding proceeds, it is moved along the seam to be welded. Callahan & Raynor, No. 1,262,-749, and Hall & Metzger, No. 996,406, show similar arrangements; and, in view of them, I do not think the Morton apparatus constitutes invention. I therefore hold that claim 34 of patent No. 1,278,985 is invalid.

■ The stabilizing resistance patent, reissue No. 15,313, is fully met by the prior use evidence showing that as early as 1916 nichrome was used by the Electric Railway Improvement Company as a stabilizing resistance for hand arc welding systems using metallic electrodes. This prior use was clearly proved, and it was shown that the resistance material used by the defendant was the same nichrome previously used by the Electric Railway Improvement Company in the hand welding systems. The reason for using the material was the same in both the hand and automatic welding systems, and the results were identical. I think, therefore, that claims 8, 20, and 25 of reissue patent No. 15,313 are plainly invalid for lack of invention.

■ The current conveying patent, No. 1,-620,219, claim 5, covers "means for conveying current to the strip at a point close to and at a fixed distance from the arc." Morton testified that, if the current was conveyed to the electrode at a point too far from the arc, the electrode would become "incandescent" and "soften so that it would very quickly break off above the arc and the arc would be lost." He therefore provided for admitting the current to the electrode "as close as possible to the arc." It would seem as if this should have been obvious to any skilled electrical engineer; and Mansbendel, the plaintiff's expert, in effect admitted as much. I am therefore forced to the conclusion that claims 5 and 7 of patent No. 1,620,219 are invalid for lack of invention.

It follows that there may be a decree declaring invalid claims 14 and 23 of the main patent, No. 1,648,560, claim 34 of the track welding patent, No. 1,278,985, claims 8, 20, and 25 of the stabilizing resistance patent, reissue No. 15,313, and claims 5 and 7 of the current conveying patent, No. 1,620,219; and also that the defendant has not infringed the remaining claims of the patents in suit; and, further, dismissing the complaint, with costs.